**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARKET PROPHIT, INC.,<br>Plaintiff,<br>v.<br>SOLFINI LLC AND CHRISTOPHER MACK,<br>Defendants. | Case No.:<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Market Prophit, Inc. ("Market Prophit" or "Plaintiff"), by and through its attorneys, Hinckley, Allen & Snyder LLP, as and for its Complaint against Defendants Solfini LLC ("Solfini") and Christopher Mack ("Mack") (collectively, "Defendants"), respectfully alleges as follows:

1. This action arises from Defendants' bad-faith seizure and wrongful withholding of Plaintiff's proprietary software, source code, trade secrets, databases, and mission-critical server infrastructure. Mack, operating through his company Solfini, served as Market Prophit's Chief Technology Officer ("CTO") under a written Independent Contractor Agreement (the "ICA"). As CTO, Defendants controlled and administered Market Prophit's online financial intelligence platform, including its website at www.marketprophit.com (the "Website"), together with the source code, executables, databases, exchange integrations, and other infrastructure that operate and support it (the "Platform"). On August 17, 2026, Defendants unilaterally seized control of and shut down Market Prophit's entire live Platform and have since refused to return Plaintiff's property or restore access thereto in complete and usable form, resulting in the cessation of Market Prophit's entire business. The shutdown has also left Market Prophit unable to demonstrate its

product to prospective investors, financing sources, and strategic partners, depriving it of the investment and financing opportunities on which its growth depends.

2. Defendants purported to justify their unlawful actions under two procedurally and substantively defective notices—the first, dated August 3, 2026, asserting $32,785.95, and the second, dated August 16, 2026, asserting $40,984.41—in allegedly unpaid hosting and software development invoices under an unwritten, month-to-month arrangement (the "Services Arrangement") that is separate and distinct from the parties' written contracts. The hosting and software development invoices contained no written payment terms and no stated due dates. The termination right under the parties' Software License Agreement (the "SLA") is triggered only when a sum due under the SLA remains unpaid for 45 days after its due date. The invoices on which Defendants relied were not sums due under the SLA, and none carried any agreed due date from which a 45-day period could run. Defendants' notices are no basis to justify termination, much less the wholesale seizure of all of Plaintiff's property.

3. Market Prophit owns all of the custom software Developments and Materials (as further defined below) created during the engagement under ICA § 4, which vests all intellectual property rights in Market Prophit immediately upon creation. Mack personally acknowledged and agreed to ICA § 4 as the designated "Representative," signing that provision in his individual capacity. The ICA's intellectual-property, confidentiality, and remedies provisions expressly survive any termination of the agreement and remain binding on Defendants.

4. Market Prophit requested in writing that Defendants return its property, including by providing dedicated migration server credentials on September 28, 2026, to facilitate the orderly return of that property. Defendants have, nonetheless, withheld critical components and failed to return Market Prophit's property in complete or usable form. The limited materials Defendants

have provided are incomplete and insufficient to restore the Platform, including its social media account copy trading functionality. Among other deficiencies, the materials omit source code files belonging to Market Prophit and the modifications made to them, omit the Git repositories in which Market Prophit's code and its development history are maintained (a "Git repository" being a digital storage space managed by a third-party source code management and hosting platform such as GitLab, Bitbucket and GitHub, that maintains a distributed version control system that contains a project's source code and other files together with the complete, cryptographic history of every modification made to them over time), and omit all database backups and snapshots. Upon information and belief, Defendants' conduct is designed to coerce Market Prophit into accepting terms favorable to Defendants by holding hostage the entirety of Market Prophit's business.

5. Market Prophit brings this action seeking: (a) specific performance compelling the immediate delivery and transfer to Plaintiff of all source code, executables, documentation, Git repositories, databases, and all other property belonging to Market Prophit, in usable format and wherever located and whether in the possession, custody, or control of Defendants or of any developer, subcontractor, or other person or entity acting on their behalf or under their direction or control; (b) preliminary and permanent injunctive relief prohibiting Defendants from destroying, concealing, transferring, or further misappropriating Plaintiff's intellectual property and proprietary assets; (c) declaratory judgment establishing Plaintiff's sole and exclusive ownership rights and voiding Defendants' procedurally and substantively defective termination notices; and (d) damages caused by Defendants' misconduct.

## PARTIES

6. Plaintiff Market Prophit is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Market

Prophit is an AI-powered specialized digital asset financial technology intelligence, data analytics, and social media account copy trading platform. The Platform ingests social-media data, analyzes crowd sentiment regarding digital assets, quantitatively scores and ranks social-media accounts by predictive accuracy, and generates automated trading signals. Market Prophit's President is Igor Gonta ("Gonta").

7. Defendant Solfini is a limited liability company organized under the laws of the Commonwealth of Puerto Rico, with its principal place of business in Puerto Rico. Upon information and belief, Solfini's sole member is Mack, who resides in and is domiciled in the Commonwealth of Puerto Rico, making Solfini a citizen of Puerto Rico for purposes of 28 U.S.C. § 1332.

8. Upon information and belief, Mack is the sole Director, owner, and member of Solfini. Mack signed the ICA as "Director" of Solfini and separately and personally acknowledged and signed the ICA § 4 intellectual-property provisions in his individual capacity as the designated Representative. Following the end of the ICA Term, Mack continued to function as Market Prophit's de facto CTO, exercising sole and exclusive control over Market Prophit's technology infrastructure. Mack personally participated in, directed, and controlled all conduct giving rise to this action.

9. Mack is liable directly for his own conduct, including under ICA § 4, which he signed in his individual capacity, and as the person who personally directed and participated in the tortious conduct alleged herein. In addition, and in the alternative, Solfini is Mack's alter ego, such that Mack is liable for Solfini's obligations under the ICA, the SLA, the Services Arrangement, and the Bitget Agreement. Mack exercised complete domination and control over Solfini: upon information and belief, he is its sole Director, owner, and member; he signed correspondence and

demands as "Chris Mack, Director, Solfini LLC"; he conducted Solfini's business, including issuing invoices and corresponding on Solfini's behalf, including through the email account commoditybull@gmail.com; he personally directed all of Solfini's invoice and termination decisions at issue in this litigation; and he personally performed all CTO services attributed to Solfini throughout the engagement. Mack used Solfini as a vehicle to carry out the misconduct alleged herein, including the August 17, 2026 seizure and shutdown of Market Prophit's Platform and the continued withholding of Plaintiff's property, while positioning Solfini as the only party answerable for that conduct. Respecting Solfini's separate form under these circumstances would work an injustice and unfairness by permitting Mack to immunize himself from personal liability for misconduct he personally directed and committed and to leave Plaintiff without a meaningful remedy.

## JURISDICTION AND VENUE

10. This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

11. This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). Market Prophit is a citizen of Delaware and New York. Mack is a citizen of Puerto Rico. Solfini, a limited liability company whose sole member is Mack, is a citizen of Puerto Rico. No Defendant is a citizen of any State of which Plaintiff is a citizen, and complete diversity of citizenship therefore exists. The amount in controversy exceeds $75,000, exclusive of interest and costs, because, among other things, Market Prophit seeks damages for the loss of its entire business operation since August 17, 2026, including lost revenue, lost business opportunities, and lost investment and financing opportunities; the monies it paid for undelivered works, and the costs of reconstructing and replacing withheld code, models, and data; and because the value of the property, measured

by the value of the Platform to Market Prophit, exceeds $75,000.

12. This Court has supplemental jurisdiction over all state-law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

13. Plaintiff seeks declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and Rule 57 of the Federal Rules of Civil Procedure, within the jurisdiction conferred by 28 U.S.C. §§ 1331, 1332, and 1367. An actual, justiciable controversy of substantial immediacy and reality exists between the parties regarding their respective rights, duties, and obligations under the ICA, the SLA, the Services Arrangement, and the Bitget Agreement.

14. This Court has personal jurisdiction over Defendants pursuant to N.Y. C.P.L.R. §§ 302(a)(1) and 302(a)(3), made applicable to this Court through Fed. R. Civ. P. 4(k)(1)(A). Defendants transacted business in the State of New York by: (a) entering into the ICA with Market Prophit, a New York-based company; (b) providing services to Market Prophit's New York-based business; (c) issuing invoices to and receiving payment from a New York company; (d) directing notices, demands, and litigation threats to Market Prophit's New York address; (e) maintaining a continuous business relationship with a New York company; and (f) through Mack, meeting in person with Market Prophit's President in New York, including in Manhattan, Queens, and on multiple occasions at New York airports. Additionally, Defendants committed tortious acts outside New York—including the coercive shutdown of Market Prophit's Platform and refusal to return Market Prophit's property—that caused injury to Market Prophit within New York, as Defendants should have known and expected. Mack's personal participation in and direction of the tortious conduct described herein, directed at a New York company, independently subjects him to personal jurisdiction in this Court.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a

substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District. Market Prophit operates from and is headquartered in the Southern District of New York. Defendants directed their contractual performance, invoicing, termination notices, equity demands, and tortious conduct into this District. The harm to Plaintiff's business—including loss of its Platform, interruption of its commercial operations, and damage to its business relationships—is felt principally in this District.

## FACTUAL ALLEGATIONS

### A. Market Prophit's Business and Pre-existing Property

16. Market Prophit develops and operates an online financial data and intelligence and social media account copy trading platform accessible through the Website. The Platform is the means by which Market Prophit delivers its product to subscribers and is, in substance, Market Prophit's entire business operation. The Platform is also the means by which Market Prophit demonstrates its product to prospective investors, financing sources, and strategic partners, on whom Market Prophit depends to fund and grow its business. The Platform ingests social-media data and generates proprietary sentiment signals and other data and intelligence for digital assets. The Platform calculates data and statistics to measure the statistical significance of sentiment shifts, quantitatively scores and ranks social-media accounts by the historical predictive accuracy of their commentary regarding digital asset directional price movement, and generates automated trading signals based on those scores, rankings, and sentiment signals. Market Prophit's social media account copy trading service permits subscribers to dynamically allocate their funds based on the signals of scored social media accounts, with directional (copying) or anti-directional (inverse copying) execution, as well as dynamic multi-account signal trade execution, into subscriber exchange accounts at Binance, Bybit, MEXC, and Bitget that are integrated into the

Platform.

17. Prior to engaging Defendants, Market Prophit had independently developed and owned core intellectual property, including but not limited to the core codebase, raw source code, API code, API executables, database architecture, and executable files that formed the foundation of its live Website and Platform. When Market Prophit transferred its pre-existing codebase, database exports, and executable files to Solfini in a compressed archive, it was solely to facilitate migration of those files to Solfini's cloud provider in connection with the services Defendants provided to Plaintiff. Market Prophit retained sole legal title to all transferred files and at no time intended to, or did, convey any ownership interest, intellectual property right, or any other proprietary interest to Solfini. Solfini received these files solely as custodian and for the limited purpose of providing hosting services.

18. Defendants' relationship with Market Prophit was governed by four distinct arrangements: (a) the ICA, dated November 6, 2023 and effective October 5, 2023, under which Solfini, through Mack, provided CTO-level services in exchange for equity compensation; (b) the SLA, dated October 8, 2024, under which Solfini licensed certain identified software to Market Prophit in exchange for a license fee calculated as a percentage of subscription fees received by Market Prophit from third party users of its Platform; (c) the Services Arrangement, which began in or about January 2024, under which Solfini provided hosting and additional software development services not covered by the ICA or the SLA, and for which Solfini issued invoices; and (d) a separate agreement, formed in March 2026, under which Defendants agreed to develop the integration of the Bitget cryptocurrency exchange into Market Prophit's Platform for a fixed price and on defined completion and payment terms (the "Bitget Agreement"). Each of these arrangements is described below. The invoices on which Defendants based their purported

termination notices were issued solely under the Services Arrangement.

**B. The Independent Contractor Agreement**

19. On or about November 6, 2023 (effective October 5, 2023), Market Prophit and Solfini, through its Director, Mack, executed the ICA. ICA § 1 defines the term of the engagement as the period beginning on October 5, 2023 "and continuing until October 4, 2025 or the date of termination pursuant to Section 15" (the "ICA Term").

20. ICA § 1 requires Solfini to provide its designated agent, Mack, to serve as Market Prophit's "Chief Technology Officer" and to provide services "including, without limitation, maintaining the Company's website and technology infrastructure, building additional functionality and subscription service features offerings, developing and launching paid monthly subscription-based products such as a social media account copy trading platform and other sophisticated tools, in each case as requested and specified by the Company, and such additional software development services as may be reasonably requested by the Company." Upon information and belief, Mack personally performed, or directed and supervised, the services Solfini provided throughout the ICA Term, including services performed by developers, subcontractors, or other personnel engaged by Defendants. ICA § 4 requires Solfini to "assure that all individuals (and entities) who contribute in any respect to such Developments have fully assigned to Contractor all intellectual property rights therein."

21. ICA § 2 set forth Solfini's compensation: 117,648 restricted shares of Market Prophit common stock, stated as 10.0% of Market Prophit's then-current capitalization, vesting at the rate of 4,902 shares per month, starting October 31, 2023 and continuing on the last day of each calendar month during the ICA Term, pursuant to Market Prophit's 2023 Equity Incentive Plan and Solfini's Stock Restriction Agreement.

22. ICA § 4 contains a comprehensive intellectual-property assignment and work-for-hire provision with a broad scope. Under § 4, all software developments, works, inventions, discoveries, improvements, materials, and deliverables created, conceived, or reduced to practice by Solfini or its personnel in connection with services performed under the ICA (collectively, "Developments and Materials") are the sole and exclusive property of Market Prophit immediately upon creation—without further act, assignment, or payment by Market Prophit. All such Developments and Materials constitute works made for hire to the maximum extent permitted by law. Section 4 further requires that Solfini and its personnel "communicate, without cost or delay and without publishing the same, all available information relating thereto (with all necessary plans and models)" to Market Prophit. In the event any Developments and Materials do not qualify as works made for hire under applicable law, § 4 includes a backup, present-tense assignment of all rights, title, and interest therein to Market Prophit, including all copyrights, patent rights, trade secret rights, and other intellectual property rights. Section 4 also grants Market Prophit a power of attorney to execute any documents necessary to perfect Market Prophit's ownership rights.

23. Section 4 provides that "the Levidge exchange, and Carbon.Credit exchange and their products and features are inventions created by Contractor prior to this Agreement and, therefore, excluded from the terms and conditions of this Agreement; provided, however, that, if Contractor includes any pre-existing components or elements in the Materials, then those pre-existing components or elements shall be deemed to be licensed to the Company hereunder as a fully-paid, royalty-free, perpetual and non-exclusive license." Accordingly, to the extent Solfini and Mack incorporated any pre-existing component or element—including any component or element of the Levidge exchange or Carbon.Credit exchange—into the Developments and Materials delivered to Market Prophit, Market Prophit holds a fully-paid, royalty-free, perpetual

license to use that component or element as part of its Platform. Market Prophit's perpetual royalty-free license to such pre-existing components or elements survives any termination of the ICA.

24. ICA § 5 imposes confidentiality obligations on Defendants with respect to Market Prophit's confidential "Information," including trade secrets, business strategies, financial plans and records, and information developed by Solfini in the course of performing the services, and makes Solfini responsible for any breach of Section 5 by its employees, agents, consultants, or subcontractors.

25. ICA § 8 provides that any breach or threatened breach of the ICA by Solfini would cause Market Prophit irreparable damage, and that Market Prophit is accordingly entitled to injunctive relief, specific performance, and other equitable relief to prevent the violation of Solfini's obligations, without the necessity of any proof of actual damages or the posting of a bond or other security.

26. ICA § 15 expressly provides that Sections 2, 4, 5, 8, 9, 12, 13, and 14 survive the expiration or termination of the ICA. Accordingly, Defendants' obligations to transfer all Developments and Materials to Market Prophit, maintain the confidentiality of Market Prophit's proprietary information, and submit to specific performance and injunctive relief remain fully binding and enforceable regardless of any claimed termination or expiration of the ICA Term.

27. In addition to signing the ICA as "Director" of Solfini LLC, Defendant Mack separately signed ICA § 4 in his individual capacity as the designated Representative, under the legend "ACKNOWLEDGED AND AGREED as per Section 4 only." By that signature, Mack personally agreed to the obligations of Section 4, including its intellectual-property assignment and work-for-hire provisions, the obligation to assure that all contributors assign their rights, and the obligations to promptly disclose each Development and to communicate all available

information relating thereto, with all necessary plans and models. Mack is therefore individually and personally bound by Section 4 of the ICA.

28. ICA § 15 permits either party to terminate the ICA "at any time, for any or no reason," but only "upon 30 days' prior written notice to the other party." On March 1, 2025, Mack advised Gonta by email that he would be "stepping down as CTO at the end of March," while assuring Gonta that "we will continue to maintain the platform, and as an owner/partner, I will remain committed to cheering on the success of MarketProphit." On March 31, 2025, Mack wrote that it was his "last day as CTO," while again affirming that "[a]s an owner and partner, I will continue to support the company and cheer on its growth." Neither communication referenced the ICA or § 15, or purported to terminate the ICA. Consistent with Mack's assurances, Solfini continued to provide services thereafter and Mack continued to function as Market Prophit's de facto CTO.

29. To the extent Solfini contends that the ICA terminated effective March 31, 2025, Mack's emails relinquished only the CTO title and did not constitute written notice of termination of the ICA under § 15. As such, the ICA was not terminated on that date. In the alternative, even if the ICA terminated on or about March 31, 2025, the ICA's surviving provisions remain fully binding on Defendants.

30. During the ICA engagement, Mack, acting through Solfini, built three cryptocurrency exchange integrations for Market Prophit's Platform: integrations with Binance, Bybit, and MEXC. These integrations were built as part of the services provided under the ICA and constitute Developments and Materials owned solely by Market Prophit under § 4. Additionally, Mack developed and implemented a quantitative model that reads and ingests Market Prophit's proprietary sentiment signals and generates automated trading instructions and defined

trade execution rules. Mack integrated and embedded this model into Market Prophit's Platform. Mack failed and refused to deliver written specifications or documentation for this model at the time it was developed. In doing so, Defendants violated ICA § 4, which provides that all Developments "shall immediately become the sole and absolute property of the Company," and which requires Defendants to (i) "assure that all individuals (and entities) who contribute in any respect to such Developments have fully assigned to Contractor all intellectual property rights therein," (ii) "promptly disclose to the Company each such Development," and (iii) "communicate, without cost or delay and without publishing the same, all available information relating thereto (with all necessary plans and models) to the Company." Defendants did none of these things.

31. Whether the ICA terminated on March 31, 2025, or continued through the expiration of the ICA Term on October 4, 2025, the surviving obligations under Sections 2, 4, 5, 8, 9, 12, 13, and 14 remain in full force and effect.

32. Notwithstanding Mack's March 2025 emails relinquishing the CTO title, and even following the end of the ICA Term, Mack continued to function as Market Prophit's de facto CTO in all practical and operational respects. Mack remained the sole technical point of contact for all matters relating to the Platform; he served as the exclusive administrator of Market Prophit's servers, codebases, and deployment infrastructure; he directed and managed subcontractors engaged to work on the Platform, whom he described only generally as located in India and Sri Lanka, while deliberately insulating those subcontractors from direct contact with Market Prophit's management and refusing Market Prophit's repeated requests that he identify them so that Market Prophit could assess their suitability and qualifications, and communicate with them directly; he continued to build and maintain Market Prophit's technology infrastructure; he continued to use a Market Prophit email account to conduct Market Prophit business, including

after relinquishing his CTO title; he attended industry conferences with Gonta on Market Prophit's behalf, including the 2026 Bitcoin conference; he regularly discussed business strategy and additional product launches with Gonta; he spoke with prospective industry partners, customers, and investors; he discussed marketing strategy for Market Prophit's social media account copy trading service; and Market Prophit relied upon Mack as the company's technology leader. Market Prophit had no other individual capable of performing or overseeing its technology operations, and Mack exploited this dependency.

**C. The October 8, 2024 Software License Agreement**

33. On or about October 8, 2024, Market Prophit and Solfini executed the SLA. The SLA granted Market Prophit a non-exclusive, worldwide license to use certain named software projects and components, to the extent integrated into or used in the Platform, for a term running through December 31, 2034, subject to earlier termination upon specified events.

34. SLA § 3 provides for a license fee calculated as a percentage of subscription fees received by Market Prophit from third-party users of its Platform. Subscription fees from third-party users of the Platform have been minimal or nonexistent, and, upon information and belief, subscription payments, if any, were processed through systems administered and controlled by Defendants, such that Market Prophit has no record of having received them. Defendants never invoiced, demanded, or reported any License Fee under SLA § 3, and neither of Defendants' August 2026 notices identified any unpaid License Fee.

35. SLA § 2 permits Solfini to terminate only upon specified events, including if "any sum or fee due to the Licensor remains due and unpaid for forty-five (45) days or more after the due date." No such event had occurred. No license fee or other sum was owed under the SLA, and no provision of the SLA makes alleged nonpayment of sums arising under any other agreement or

arrangement between the parties a default under, or a ground for termination of, the SLA. Solfini's purported termination of the SLA in August 2026 was therefore unauthorized and without effect.

36. SLA § 8 provides that both parties acknowledge that any breach or threatened breach by the other party would cause irreparable damage, and each party is entitled, in addition to remedies at law, to injunctive relief, specific performance, and other equitable relief without the necessity of proving actual damages or posting a bond or other security.

**D. The Services Arrangement**

37. In addition to the ICA and the SLA, Market Prophit and Defendants operated under the Services Arrangement, an unwritten, month-to-month arrangement under which Solfini provided hosting and software development services not covered by the ICA or the SLA. Defendants began providing hosting services under the Services Arrangement in January 2024, and software development services were added later, in July 2024.

38. Notwithstanding Market Prophit's repeated requests, Mack had refused to execute a written agreement that would have governed the hosting and software development services Solfini provided, even though the SLA itself contemplated that the parties would enter into a separate agreement governing those services. Instead, Mack continued on an unwritten, month-to-month basis, issuing monthly invoices combining $11,500 for software development services with a monthly hosting charge of approximately $4,900, none of which contained stated due dates, payment terms, or a payment schedule. Upon information and belief, Mack refused to execute a written agreement in order to maintain leverage over Market Prophit: by avoiding any written deliverables schedule, intellectual-property terms, or payment terms, Mack preserved his ability to dictate when payment was due, to dispute Market Prophit's ownership of the work he performed, and to condition continued services performed, timing of delivery of requested code bug fixes, and

access on terms of his choosing.

39. At some point during the Services Arrangement, Mack unilaterally and without authorization or notification altered the description on his Services Arrangement invoices from "Software development" to "Software maintenance." Specifically, on April 1, 2026, Mack emailed Gonta the March 2026 invoice, billing $11,500 for "Software maintenance." Gonta discovered this manipulation and compelled Mack to revert the invoice description to "Software development," which Mack did on April 13, 2026, resending a revised invoice billing the same $11,500 as "Software development." This incident reflects Mack's bad faith and his awareness of the ownership implications of the work he was performing.

**E. The Bitget Agreement**

40. On March 6, 2026, Mack emailed Gonta offering to "add the Bitget implementation for $18,500," with an estimated timeline of approximately one month, and stating that the integration would "support the same functionality currently available in the Binance, Bybit, and MEXC implementations" (the "Bitget Integration").

41. On March 12, 2026, Gonta responded in writing setting out the terms of the engagement: "this Bitget integration will be performed by a dedicated developer focused exclusively on this project full time for the term of this engagement which shall be completed in approximately one month. Payment will be made in 2 installments. 50% upfront and 50% upon completion of integration and full and successful testing of all Copy Trading functionality." Gonta asked Mack to confirm his agreement and to issue an invoice for the first installment. Less than an hour later, Mack accepted those terms by issuing an invoice for "the first half of the Bitget implementation."

42. The Bitget Agreement was memorialized in writing, fixed a price for a defined

deliverable, set a completion timeline, required a dedicated developer, and conditioned final payment on completion and successful testing, and Solfini invoiced it separately from its monthly Services Arrangement invoices.

43. Market Prophit paid the first installment of $9,250 on or about March 13, 2026. On May 3, 2026, Mack invoiced the second installment. After the Bitget Integration first executed trades correctly on May 11, 2026, Market Prophit paid the second installment of $9,250 on May 12, 2026, bringing its total payment to the full $18,500.

44. Despite receiving payment in full, Defendants failed and refused to deliver the uncompiled source code, executables, and Git repositories for the Bitget Integration. The Bitget Integration was developed specifically for Market Prophit, at its request, under the Bitget Agreement, and was paid for in full. As a deliverable that Market Prophit commissioned and paid for in full under the Bitget Agreement, the Bitget Integration is owned solely by Market Prophit. In the alternative, the circumstances of the Bitget Agreement—including Market Prophit's full payment, its reasonable expectation of receiving and using the deliverable, and the absence of any agreement restricting its use—give rise to an implied assignment of all rights in the Bitget Integration to Market Prophit or, at minimum, an implied, irrevocable license in Market Prophit's favor to use, modify, and deploy it.

**F. Defendants' Defective Termination Notices**

45. On July 31, 2026, Mack emailed the July 2026 Services Arrangement invoice, stating that it was "due upon receipt," and asserted that the June 2026 Services Arrangement invoice was "past due since July 1." Those purported due dates were unilateral, after-the-fact positions; no due date or payment term was ever stated or agreed for any invoice.

46. On August 3, 2026, Defendants transmitted a formal notice to Market Prophit,

invoking the notice provision of the SLA, asserting allegedly unpaid June and July 2026 invoices, neither of which was an SLA invoice or had remained unpaid for 45 days after any agreed due date, and purporting to terminate the parties' "separate recurring monthly hosting and operational-services arrangement." The notice announced that Solfini would cease hosting, operating, maintaining, and supporting "the entire Market Prophit website and platform" effective August 17, 2026 at 5:00 p.m. Eastern Time. This notice was substantively defective and coercive because it threatened to shut down the entire Platform, including SLA-licensed functionality, based on non-SLA invoices. The notice thus constituted a threatened breach of the SLA.

47. On August 16, 2026, Defendants transmitted a second purported notice, titled "Formal Notice of Termination of Software License Agreement," which purported to terminate the SLA under SLA § 2 effective August 16, 2026. The notice asserted that the June 2026 Services Arrangement invoice constituted "a breach and default under the parties' separate recurring monthly hosting and operational-services arrangement," and added to the claimed balance a newly issued final invoice of $8,198.46 for hosting and platform services from August 1 through August 15, 2026, bringing the total claimed to $40,984.41. Once again, the invoice due dates asserted by Defendants were unilateral, after-the-fact positions that were never stated or agreed to. This second notice was equally defective.

48. Neither of Defendants' purported termination notices was contractually authorized. As an initial matter, the SLA's termination provision was never triggered because the invoices on which Defendants relied were not sums due under the SLA. The disputed invoices are for hosting and software development services rendered under the Services Arrangement—as distinct from the license fee payable under SLA § 3—and those amounts do not trigger the SLA's termination provision, including because the SLA contains no cross-default provision. Solfini's own August 3

notice characterized the invoices as arising under the "separate recurring monthly hosting and operational-services arrangement" and purported to terminate only that arrangement, confirming that the invoices were not sums due under the SLA. SLA § 3 is the only provision of the SLA that fixes both an amount payable by Market Prophit—the License Fee of fifteen percent (15%) of subscription fees received from third-party users—and a due date for that amount, "no later than thirty (30) days following the end of such calendar month." SLA § 2's reference to a sum unpaid "after the due date" therefore refers to a due date established under the SLA, not to separately invoiced software development or hosting charges under the Services Arrangement, or any other agreement, for which the SLA establishes no due date. Defendants' attempt to invoke the SLA's termination provision based on non-SLA invoices further demonstrates the defective and pretextual nature of their notices.

49. Even if the SLA's termination provision could be triggered by sums invoiced under the Services Arrangement, no such sum had remained unpaid for 45 or more days after any agreed due date when Defendants issued either notice. The termination right under the SLA requires that a payment remain unpaid for 45 or more days after the applicable due date. The invoices underlying the notices contained no stated due dates, and the Services Arrangement under which they were issued fixed no time for payment.

50. The parties never agreed on when any invoice would become due, and Solfini's assertions that the June invoice was "due July 1" and the July invoice was "due upon receipt" were unilateral, after-the-fact positions that were never agreed. Accordingly, no contractual right of termination under the SLA had accrued when Solfini issued either notice, and Solfini's notices, which depended on sums not due under the SLA and/or on a due date that was never agreed, were void and of no legal effect.

### G. The Unauthorized Platform Shutdown and Hostage Tactics

51. On or about August 17, 2026, Defendants executed a deliberate and comprehensive shutdown of Market Prophit's entire Platform. Defendants disabled Market Prophit's API endpoints and took offline all servers and infrastructure necessary to operate the Platform. The shutdown was total and immediate, without any meaningful transition period or ability to migrate or preserve Market Prophit's operational state prior to Defendants' action.

52. The shutdown was not a legitimate exercise of any contractual right. Rather, it was designed to force Market Prophit to pay the disputed invoices under threat of permanent loss of Market Prophit's entire business. Defendants control the sole or primary copies of Market Prophit's source code, databases, infrastructure, and other property; without the return of these assets, Market Prophit is incapable of resuming operations.

53. Market Prophit's property is at imminent risk of loss, alteration, or permanent destruction while in Defendants' custody. Upon information and belief, Defendants have commingled Market Prophit's Git repositories with Solfini's own code and client projects, creating a risk that Market Prophit's proprietary assets will be confused, overwritten, or incorporated into other projects. There is also a risk that Defendants may resell, license, or otherwise misappropriate Market Prophit's trade secrets and proprietary technology for Defendants' own benefit or for the benefit of third parties.

54. Market Prophit's Platform—its primary infrastructure—has been disabled since August 17, 2026. Since the shutdown, users have reported that the Website is down and inaccessible, and prospective users have contacted Market Prophit seeking to sign up for its Platform and copy trading service, but have been unable to do so. Bitget publicly announced its strategic integration with Market Prophit's Platform in April 2026, and Market Prophit is on the

schedule to begin joint cross-marketing of that newly announced partnership with Bitget, but has been unable to do so. Market Prophit also depends on its ability to demonstrate the live Platform to prospective investors, financing sources, and strategic partners in order to raise capital and form new business relationships, and with the Platform offline it cannot do so. As a result, Market Prophit has lost revenue and business opportunities, including those arising from its Bitget partnership, has lost investment, financing, and partnership opportunities, and has suffered harm to its user, customer, investor, and exchange-partner relationships and goodwill, in amounts to be proven at trial.

55. As a result of the shutdown, Market Prophit's customer accounts have been disrupted and the Platform's integrations with cryptocurrency exchanges, including Binance, Bybit, MEXC, and Bitget, have been severed. Market Prophit's customer relationships, goodwill, and business reputation continue to erode each day the Platform remains offline.

56. The Platform is Market Prophit's core business asset, and its subscription revenue, customer relationships, exchange partnerships, and ability to attract investment and financing all depend on the Platform being operational. Each day the Platform remains offline, the harm to those relationships compounds, and customers, partners, and prospective investors lost during the outage may not return even after the Platform is restored. Absent prompt relief, that harm will become permanent.

57. Defendants possess and control the only complete and current copies of Market Prophit's source code, executables, quantitative models, databases and database backups and snapshots. Although Defendants transferred certain files, that transfer was incomplete and not current. Among other things, it omitted the exchange-integration code, all database backups and snapshots, and code reflecting all of the latest modifications to Market Prophit's software.

Defendants unilaterally determined which materials they would treat as Market Prophit's property and withheld property that is due to Market Prophit. While that property remains in Defendants' exclusive control, there is an ongoing risk that it will be altered, deleted, or destroyed; commingled with Solfini's own code; or used, disclosed, or licensed to third parties.

58. The harm Market Prophit has suffered and continues to suffer is impossible to quantify. The value of lost business opportunities, lost investment and financing opportunities, lost revenue from subscribers, reputational damage, and the competitive harm that would result from disclosure of Market Prophit's proprietary algorithms cannot be reduced to a definite sum, and money damages cannot substitute for the return of proprietary technology that exists only in Defendants' possession.

59. Before Defendants' shutdown on August 17, 2026, Market Prophit's Platform was fully operational. Defendants' unilateral seizure of the Platform disrupted that status quo, and returning Market Prophit's property to its possession and control would restore the parties to the position that existed before Defendants' wrongful conduct.

**H. Solfini's Equity Demand and Market Prophit's Demand for Return of Its Property**

60. On or about August 14, 2026, Mack, signing as "Chris Mack, Director, Solfini LLC," transmitted to Market Prophit a written equity demand in which Defendants asserted an entitlement to 88,236 vested shares of Market Prophit common stock. The demand was accompanied by a proposed Equity Cure Agreement and a proposed Tolling Agreement, both of which were unsigned and presented as conditions to any resolution of the dispute. Defendants' equity demand was made three days before the coercive August 17 shutdown and formed part of the same coordinated pressure campaign.

61. Before September 28, 2026, Mack had provided Market Prophit with access to a

server from which Market Prophit could retrieve its files, but the credentials he provided did not work. Market Prophit repeatedly requested working credentials. Mack stopped responding and instead demanded that Market Prophit set up its own server, which Market Prophit did.

62. On September 28, 2026, Market Prophit provided Defendants with dedicated migration server credentials to facilitate the return of Market Prophit's property. Market Prophit requested in writing that Defendants transfer its data, code, assets, and property to that server and identify those responsible for the transfer. Solfini nevertheless failed to return all of Market Prophit's property and intellectual property, and failed to provide the technical contact(s) for related questions as Market Prophit had requested.

63. On or about September 28, 2026, Defendants began transferring certain files to the server. The transfer concluded on October 6, 2026. During the transfer, persons acting on Defendants' behalf accessed the migration server from personal computers, including from locations in Sri Lanka. The transfer was incomplete and omitted critical components necessary to operate Market Prophit's Platform, including source code and executable files. The omitted property includes, without limitation: Developments and Materials and other intellectual property developed under the ICA; pre-existing components or elements that Defendants included in the Materials, to which Market Prophit holds a fully-paid, royalty-free, perpetual license; software and other deliverables developed under the Services Arrangement; and the Git repositories in which that property is maintained—in each case whether developed by Mack or by any developer or subcontractor acting under his direction or control, wherever maintained, through and including August 17, 2026. Market Prophit owns or holds a license to all such property.

64. Defendants' partial transfer did not return Market Prophit's property and does not permit Market Prophit to operate its Platform and business.

**I. The Intellectual Property at Issue**

65. The intellectual property and proprietary assets at issue fall into five categories, each of which is owned by or licensed to Market Prophit, and none of which Defendants have any right to withhold:

66. **First**, all software, source code, databases, models, executables, documentation, and other deliverables created, conceived, or reduced to practice by Solfini or Mack, or any contractors under Defendants' control and direction, in connection with services performed under the ICA are Developments and Materials owned solely and exclusively by Market Prophit, including under ICA § 4. Market Prophit's ownership of these assets vested immediately upon creation and is not subject to any lien, right of retention, or right of termination by Defendants.

67. **Second**, to the extent Solfini or Mack included any pre-existing components or elements in the Developments and Materials, Market Prophit holds a fully-paid, royalty-free, perpetual license under ICA § 4 to use those components or elements as part of its Platform, including all materials and components necessary to operate, maintain, and deploy the Platform. This license applies regardless of whether any such component or element is also identified in any appendix to the SLA. The license survives any termination of the ICA pursuant to Section 15, is independent of the SLA and unaffected by any purported termination of the SLA, and cannot be terminated by Defendants.

68. **Third**, Market Prophit holds a license under SLA § 1 to the software projects and components identified in the SLA, which remains in full force and effect through December 31, 2034 and has not been validly terminated, and Market Prophit owns the property acknowledged in SLA Appendix A as owned by Market Prophit, including the PHP website code, the baseline zip archive and all modifications thereto, the 24 Java executables, and the MP_PROD database.

Defendants have no right to withhold the SLA-licensed software or any property identified in SLA Appendix A.

69. **Fourth**, all software, source code, and other deliverables developed by Mack or Solfini, or any contractor under Defendants' control and direction or contract, under the Services Arrangement are owned by Market Prophit. The circumstances of the Services Arrangement—including Market Prophit's payment for the deliverables, its reasonable expectation of receiving and using them, and the absence of any agreement restricting their use—give rise to an implied assignment of all rights to Market Prophit. In the alternative, and at minimum, Market Prophit holds an implied, irrevocable license to use, modify, and deploy all such deliverables.

70. **Fifth**, the Bitget Integration, including all source code, executables, repositories, and other deliverables developed under the Bitget Agreement by Mack, Solfini, or any developer or subcontractor acting under their direction or control, is owned by Market Prophit or, in the alternative, is subject to an implied assignment or an implied, irrevocable license in Market Prophit's favor, as alleged above.

### J. Plaintiff Is Entitled to Specific Performance

71. The ICA is a valid, binding and enforceable contract. Section 4 vests all Developments and Materials in Market Prophit and mandates that Defendants "communicate, without cost or delay and without publishing the same, all available information relating thereto (with all necessary plans and models) to the Company." ICA § 8 expressly authorizes specific performance. Mack personally acknowledged and agreed to Section 4 as the designated Representative and is bound by it.

72. The SLA is a valid, binding and enforceable contract. SLA § 1 grants Market Prophit a non-exclusive, worldwide license to use the licensed software through the SLA term.

SLA § 4 obligates Solfini to assist with installation and configuration and to provide support "as are necessary or reasonably requested by Licensee in order to ensure that Licensee can enjoy the full functionality of the Software during the Term." SLA § 8 provides that both parties acknowledge that any breach or threatened breach would cause irreparable damage and that each party has the right to injunctive relief, specific performance and other relief without the necessity of proving actual damages or posting a bond or other security.

73. The Services Arrangement is a valid, binding and enforceable agreement under which Defendants agreed to provide hosting and custom software development services in exchange for payment, and Market Prophit paid for all the software and other deliverables developed thereunder. Defendants breached and refused to perform the Services Arrangement by withholding the software and deliverables developed under the Services Arrangement, which are owned by Market Prophit by implied assignment or, at minimum, are subject to an implied, irrevocable license in Market Prophit's favor.

74. The Bitget Agreement is a valid, binding and enforceable written contract under which Defendants agreed to develop the Bitget Integration for $18,500, and Market Prophit paid the full $18,500. Defendants breached and refused to perform the Bitget Agreement by failing to deliver the uncompiled source code, executables, and Git repositories for the Bitget Integration.

75. Defendants breached and refused to perform ICA § 4 and SLA §§ 1 and 4 by shutting down Market Prophit's Platform on August 17, 2026, refusing to return all of Market Prophit's property despite Market Prophit's written request and provision of migration credentials, and beginning to transfer certain files on or about September 28, 2026 while omitting critical components necessary to operate Market Prophit's Platform.

76. Market Prophit has performed its obligations or was excused from performance and

stands ready to perform. Market Prophit has fully performed or tendered performance of all its obligations under the ICA; has provided dedicated migration server credentials; and has acted in good faith throughout.

77. Market Prophit is entitled to specific performance under SLA §§ 1, 4, and 8 against both Defendants; to specific performance under ICA § 4 against both Defendants; to specific performance of the Services Arrangement against both Defendants; and to specific performance of the Bitget Agreement against both Defendants. Defendants lose nothing by complying with an order requiring delivery of complete copies of the SLA-licensed software projects and components necessary to give effect to Market Prophit's license and the SLA's specific performance remedy, or delivery of the Services Arrangement deliverables for which Market Prophit has paid and the Bitget Agreement deliverables for which Market Prophit has paid in full.

78. Market Prophit has no adequate remedy at law. The current versions of, and all modifications to, Market Prophit's source code, quantitative model, exchange integration modules, databases and database backups, and deployment configurations, together with the components Market Prophit is licensed to use, are unique, and in their current and complete form exist only in Defendants' possession. Reconstruction, even if possible, would require substantial time and expense while the Platform remains offline and could not replicate the development history and modifications Defendants are withholding. Money damages cannot substitute for the prompt return of property that exists only in Defendants' possession.

79. The balance of equities overwhelmingly favors specific performance. Market Prophit faces the loss of its entire business, including its ability to attract investment and financing. Defendants face no cognizable harm from delivering copies of property they contractually agreed to provide.

80. Market Prophit is entitled to an order of specific performance compelling Defendants to: (a) deliver complete, current, uncompiled source code, executables, and full Git repositories for all Developments and Materials under ICA § 4, including, without limitation, all exchange integrations developed under the ICA (Binance, Bybit, and MEXC), all code implementing the quantitative model, any code developed under the ICA, and all other Git repositories containing Developments and Materials, whether maintained by Defendants or by any other developer, subcontractor, or other person or entity acting under the direction or control of, or under contract with, Defendants, together with written specifications, plans, models, and technical documentation as required by ICA § 4; (b) deliver complete copies of all pre-existing components and elements to which Market Prophit holds a fully-paid, royalty-free, perpetual license under ICA § 4, and the SLA-licensed software projects and components necessary to give effect to Market Prophit's license; (c) return all Market Prophit property listed in SLA Appendix A, together with all database backups and snapshots and all configuration and deployment files; (d) transfer all of the foregoing to a server under Market Prophit's control; (e) provide all technical documentation and information necessary to enable Market Prophit to operate and maintain its Platform independently; (f) execute all confirmatory assignments of intellectual property as contemplated by ICA § 4's irrevocable power of attorney; (g) deliver complete, current, uncompiled source code, executables, and full Git repositories for all software and other deliverables developed under the Services Arrangement and the Bitget Agreement, together with all credentials and other materials necessary to restore the Platform to full operation, including, without limitation, all third-party API keys, all exchange API credentials, infrastructure and database passwords, and cryptographic keys and certificates; and (h) certify under oath the completeness of the delivery, including by providing a complete inventory of every file delivered,

certifying that each delivered file is the most current version as it existed on August 17, 2026, and certifying that the delivered materials contain no virus, Trojan horse, worm, or other software designed to permit unauthorized access to, or to disable, erase, or otherwise harm, any computer, system, or software, or otherwise to prevent, restrict, or impede its use.

## CAUSES OF ACTION
## COUNT I — BREACH OF CONTRACT (INDEPENDENT CONTRACTOR AGREEMENT)

(Against Both Defendants)

81. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

82. The ICA is a valid, binding and enforceable contract. Market Prophit fully performed its obligations or was excused from performance and stands ready to perform. Sections 4, 5, and 8, among others, survived termination or expiration.

83. Defendants have breached the ICA by: (a) failing to promptly disclose and communicate to Market Prophit all available information, plans, models, and specifications relating to all Developments and Materials, including the quantitative model and the code implementing it, without cost or delay, in violation of Section 4; (b) withholding all Developments and Materials created or modified during the engagement, including, without limitation, all software, source code, algorithms, quantitative models, UI components, API adapters, data pipelines, database schemas, technical documentation, and all other Developments and Materials necessary to make the Platform fully operational, in violation of Section 4; (c) violating Market Prophit's fully-paid, perpetual, royalty-free license to any pre-existing components embedded in the Developments and Materials, in violation of Section 4; (d) using and disclosing Market Prophit's confidential information for purposes other than performing services for Market Prophit's benefit, in violation of Section 5; and (e) shutting down Market Prophit's Platform

infrastructure and refusing to return Market Prophit's property.

84. Mack is personally liable for breach of Section 4, which he acknowledged and agreed to in his individual capacity as the designated Representative.

85. As a direct and proximate result of Defendants' breaches, Market Prophit has suffered and continues to suffer substantial damages, including: (a) loss of use of the Platform since August 17, 2026; (b) lost revenue and business opportunities, including lost investment and financing opportunities; (c) costs of lost property, and of reconstructing or replacing withheld code, models, and documentation; (d) costs of migration and remediation; and (e) harm to exchange-partner relationships and goodwill, in an amount to be proven at trial.

86. In addition, Market Prophit is entitled to specific performance and injunctive relief.

## COUNT II — BREACH OF CONTRACT (SOFTWARE LICENSE AGREEMENT)

(Against Solfini)

87. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

88. The SLA is a valid, binding and enforceable contract. Market Prophit performed all valid obligations thereunder. Solfini never invoiced or demanded any License Fee under SLA § 3, and no License Fee formed the basis of either purported termination notice.

89. Solfini breached the SLA by: (a) repudiating the SLA and wrongfully purporting to terminate in August 2026, when no termination event under SLA § 2 had occurred, including (i) because the SLA contains no cross-default provision, (ii) because the invoices at issue arose under the Services Arrangement rather than as license fees under SLA § 3, (iii) because no due dates or payment terms were ever agreed for those invoices, and (iv) because no amount remained unpaid for 45 days after an agreed due date; (b) depriving Market Prophit of the license granted

under SLA § 1 by disabling Market Prophit's live servers and API execution endpoints on August 17, 2026; (c) refusing to deliver copies of, or provide access to, the SLA-licensed software projects and components necessary to provide Market Prophit with the benefit of the SLA license and specific performance under SLA § 8, including by announcing in the August 3 notice that any export would exclude "Solfini-owned or licensed software" and that Solfini would provide no access to its Git repositories, thereby confirming Solfini's refusal to perform SLA §§ 1 and 4; and (d) withholding the property that SLA Appendix A acknowledges is owned by Market Prophit, including the PHP website code, the baseline zip archive and all modifications thereto, the Java executables, and MP_PROD database.

90. As a direct and proximate result of Defendants' breaches, Market Prophit has suffered and continues to suffer substantial damages including: (a) loss of use of the licensed software and the Platform since August 17, 2026; (b) lost revenue and business opportunities, including lost investment and financing opportunities; (c) costs to replace or reconstruct licensed functionality and Market Prophit's own withheld code, modifications, and data; and (d) harm to goodwill, in an amount to be proven at trial.

91. In addition, Market Prophit is entitled to specific performance and injunctive relief.

## COUNT III — BREACH OF CONTRACT (SERVICES ARRANGEMENT)

(Against Both Defendants)

92. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

93. Market Prophit and Defendants entered into the Services Arrangement, a binding agreement under which Defendants agreed to provide hosting and custom software development services to Market Prophit and Market Prophit agreed to pay for those services.

94. Defendants breached the Services Arrangement by withholding and converting for their own benefit the software and other deliverables developed under the Services Arrangement.

95. As a direct and proximate result of Defendants' breach, Market Prophit has suffered damages, in an amount to be proven at trial.

96. In addition, and because the Services Arrangement deliverables are unique and exist only in Defendants' possession, Market Prophit is entitled to specific performance compelling delivery of those deliverables.

**COUNT IV — BREACH OF CONTRACT**
**(BITGET AGREEMENT)**
(Against Both Defendants)

97. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

98. The Bitget Agreement is a valid, binding, and enforceable contract. It was formed by Mack's March 6, 2026 written offer to develop the Bitget Integration for $18,500, Market Prophit's March 12, 2026 written acceptance setting forth the terms of the engagement, and Defendants' assent to those terms the same day by issuing an invoice for the first installment and thereafter performing. Under the Bitget Agreement, Defendants agreed to develop the Bitget Integration for Market Prophit through a dedicated developer within approximately one month, in exchange for $18,500 payable 50% upfront and 50% upon completion of the integration and full and successful testing of all copy trading functionality.

99. Market Prophit fully performed its obligations under the Bitget Agreement, including by paying the full $18,500.

100. Defendants breached the Bitget Agreement by failing and refusing to deliver the uncompiled source code, executables, and Git repositories for the Bitget Integration despite Market Prophit's payment in full, and by disabling the Bitget Integration as part of their August 17, 2026

shutdown of the Platform, thereby depriving Market Prophit of the deliverable for which it bargained and paid.

101. As a direct and proximate result of Defendants' breach, Market Prophit has suffered damages, including: (a) the value of the Bitget Integration, for which Market Prophit paid $18,500; (b) lost revenue and business opportunities, including those arising from Market Prophit's publicly announced partnership with Bitget, and lost investment and financing opportunities; and (c) costs of reconstructing or replacing the Bitget Integration, in an amount to be proven at trial.

102. In addition, and because the Bitget Integration is unique and exists only in Defendants' possession, Market Prophit is entitled to specific performance compelling delivery of the Bitget Integration, including its complete, current, uncompiled source code, executables, and repositories.

**COUNT V — MISAPPROPRIATION OF TRADE SECRETS**
**(DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836)**
(Against Both Defendants)

103. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

104. Market Prophit owns, possesses, and has the right to control the trade secrets encompassing its end-to-end quantitative analysis, social sentiment and market signal ingestion, and automated digital asset copy-trading architecture (collectively, the "Trade Secrets"). The Trade Secrets operate together as an integrated platform and are embodied in, and exemplified by, the following, including: (a) Market Prophit's natural language processing and social-sentiment engine, a proprietary pipeline that ingests unstructured social media commentary on digital assets and evaluates market sentiment in real time, including its proprietary classification methods, sentiment-scoring models, and statistical filters that distinguish actionable sentiment from

background noise and generate directional trading signals, as embodied in the PHP website code and Java executables; (b) Market Prophit's account performance-scoring and leaderboard system, including its proprietary methodologies for tracking social media accounts that publish predictive calls on digital assets, verifying those calls against benchmark pricing data, and calculating composite performance scores and rankings, as embodied in the PHP website code and Java executables; (c) the proprietary position-sizing and capital allocation logic owned by Market Prophit, other than software licensed to Market Prophit under the SLA, by which Market Prophit converts sentiment signals, account-performance scores, and subscriber-defined capital allocations into calibrated orders across its copying, inverse-copying, and multi-account copy trading modes; (d) the architecture, data models, and proprietary data structures of the MP_PROD database, which synchronize Market Prophit's sentiment and ranking outputs with market pricing, subscriber capital allocation settings, and its copy trading functionality; and (e) the non-public configurations, execution logic, and settings owned by Market Prophit through which its copy trading Platform connects to and transmits orders through digital asset trading venues, including Binance, Bybit, MEXC, and Bitget.

105. The Trade Secrets derive independent economic value from not being generally known to or readily ascertainable by proper means by others who can obtain economic value from their disclosure or use. The Trade Secrets are not publicly available and cannot be ascertained from the Platform's outputs; a competitor that obtained them could use them to replicate the Platform and its core functionality.

106. Market Prophit took reasonable measures to maintain secrecy, including by requiring Solfini, through which Mack was the sole person entrusted with administrative access to its code and databases, to maintain the confidentiality of its information under ICA § 5 (which

requires Contractor to protect Information from disclosure and to bind any subcontractors by written confidentiality agreement) and SLA § 7 (requiring Licensor to protect the confidentiality, security, and integrity of Licensee's systems and information); and by limiting access to its code and databases to Defendants as its designated technology personnel.

107. The Trade Secrets are related to products and services used in, and intended for use in, interstate and foreign commerce, including cryptocurrency exchanges operating across national and state borders.

108. Defendants acquired the Trade Secrets under the ICA and related engagement: Solfini under an express contractual duty to maintain their secrecy and to use them only to perform services for Market Prophit (ICA § 5), and Mack—as the individual who performed or directed Solfini's services, Market Prophit's CTO and later its de facto CTO, and Market Prophit's trusted technology lead—under circumstances giving rise to a duty to maintain their secrecy and limit their use. Any authorization Defendants had to access or use the Trade Secrets was limited to performing services for Market Prophit's benefit, and terminated no later than Defendants' August 17, 2026 shutdown and Market Prophit's subsequent demand for their return. Upon information and belief, Defendants have misappropriated the Trade Secrets by using them, without consent, for purposes other than Market Prophit's benefit, including by: (a) retaining copies of the code and databases embodying the Trade Secrets on servers, computers, or other devices under Defendants' control, and continuing to access, operate, or modify them after any authorization had ended; (b) commingling Market Prophit's Trade Secrets within Solfini's own code; and (c) threatening to use the Trade Secrets for Defendants' own benefit.

109. Defendants misappropriated the Trade Secrets by using, accessing, modifying, retaining, withholding, and/or threatening to use or disclose them, in breach of their agreements

and confidential duties, including: (a) upon information and belief, continuing to use, access, and modify the code, models, and databases embodying the Trade Secrets on servers, computers, or other devices and Solfini Git repositories under Defendants' control, after August 17, 2026, without authorization, and, upon information and belief, before that date for purposes other than Market Prophit's benefit, without authorization; (b) using the Trade Secrets, including by controlling the systems in which they reside, for Defendants' own commercial benefit including in connection with Mack's August 14, 2026 equity demand, Defendants' August 16, 2026 termination notice, and the August 17, 2026 shutdown; and (c) upon information and belief, commingling the Trade Secrets into Solfini's code, Git repositories, and client projects. Defendants have also retained and refused to return the Trade Secrets despite Market Prophit's demand and delivery of credentials, and despite the incomplete transfer Defendants performed, which places the Trade Secrets at continuing risk of further use and disclosure.

110. The misappropriation was willful and malicious.

111. As a direct and proximate result of Defendants' misappropriation, Market Prophit has suffered and continues to suffer actual loss, including the loss of use of the Platform and Website since August 17, 2026, lost revenue and business opportunities, lost investment and financing opportunities, and loss of competitive advantage; Defendants have been unjustly enriched by their possession, use, and/or threatened use or disclosure of the Trade Secrets; and Market Prophit faces irreparable harm from any further use or disclosure of the Trade Secrets. Market Prophit is entitled to recover its actual loss and Defendants' unjust enrichment, in amounts to be proven at trial.

112. Market Prophit is entitled to: (a) injunctive relief to prevent actual or threatened misappropriation, including prohibiting Defendants from using, disclosing, or licensing the Trade

Secrets; (b) damages for actual loss caused by the misappropriation and unjust enrichment not addressed by actual loss; (c) exemplary damages of up to two times actual damages for willful and malicious misappropriation; and (d) reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

**COUNT VI — CONVERSION**
(Against Both Defendants)

113. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

114. Market Prophit is the lawful owner of and has an immediate superior right to possess the pre-existing codebase transferred in bailment in September 2023; all Developments and Materials owned by Market Prophit under ICA § 4; the MP_PROD MySQL database; 24 Java executables; the PHP website code; and all other Market Prophit property identified in SLA Appendix A, including, without limitation, all property necessary to restore the Platform to full operation, as owned and licensed by Market Prophit (collectively, the "Converted Property"). Defendants' obligation to return the Converted Property arises independently of any contractual obligation, including from their status as bailee of the pre-existing codebase and data that Market Prophit entrusted to Solfini and Mack solely for hosting.

115. In September 2026, Market Prophit demanded the return of its property and provided migration server credentials and requested technical contact information to facilitate transfer. Defendants were obligated to return the property. Defendants failed to return all of Market Prophit's property, failed to identify the technical contacts responsible for the transfer, and instead unilaterally limited the transfer to withhold Market Prophit's property.

116. Defendants have exercised unauthorized dominion and control over Market Prophit's property to the exclusion of Market Prophit's rights by disabling the Platform, withholding Git repositories and the files they contain, and refusing to return the property

necessary to operate the Platform despite demand. Because Defendants hold the only complete and current copies of that property, their dominion has excluded Market Prophit from its use entirely. Any authority Defendants had to possess the property for hosting or custodial purposes ended no later than Market Prophit's September 2026 demand.

117. Upon information and belief, Mack personally directed and participated in the conversion, including the shutdown, retention, and refusal to return Market Prophit's property, and is individually liable as a direct participant and, in the alternative, based on Solfini's alter-ego status.

118. Market Prophit is entitled to the immediate return of all Converted Property, wherever located—including on any hosted, cloud, local, or personal computer or storage device, and whether in the possession, custody, or control of Defendants or of any developer, subcontractor, or other person or entity acting under their direction or control—together with an identification of each location where such property is or has been maintained and each person or entity that possesses or controls it, and to compensatory damages as a direct and proximate result of Defendants' conduct, including the value of the Converted Property and the loss of its use since August 17, 2026.

## COUNT VII — BREACH OF FIDUCIARY DUTY

(Against Both Defendants)

119. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

120. Mack owed fiduciary duties to Market Prophit because, in substance and in fact, he served as Market Prophit's de facto officer and agent. Mack held the title of "Chief Technology Officer" under the ICA and was identified to third parties as Market Prophit's CTO, and, after relinquishing that title in March 2025, continued to perform the same functions and to be entrusted

with exclusive administrative control over the company's server infrastructure, Git repositories, databases, and technology operations, and continued to act for Market Prophit in the other respects alleged herein, including by attending industry conferences on its behalf, participating in business strategy and product planning, and speaking with prospective partners, customers, and investors. Mack was the only person Market Prophit could contact on technology matters, and he refused to permit Market Prophit to communicate directly with any of the developers working on the Platform. Market Prophit trusted and relied upon Mack as its technology officer. Mack also continued to use a Market Prophit email account, chris@marketprophit.com, including to transmit invoices, the Bitget Integration proposal, and Defendants' August 2026 notices. Mack also repeatedly held himself out as an "owner" and "partner" of Market Prophit. Mack was an agent entrusted with the company's most sensitive proprietary information and technology assets, and was relied upon entirely by management. Mack undertook to act for Market Prophit's benefit as its CTO, and thus there was a relationship of trust and confidence, including agency in fact.

121. Solfini, as the holder of a contractual right to restricted shares of Market Prophit common stock under ICA § 2, owed duties of good faith and fair dealing to Market Prophit and its other stakeholders, is the entity through which Mack acted as CTO, and is liable for knowingly participating in Mack's breaches and, in the alternative, as Mack's alter ego.

122. Defendants breached their fiduciary duties through acts contrary to Market Prophit's interests and involving self-dealing, including: (a) abusing access and exclusive administrative control entrusted to Mack solely by virtue of his position and solely for Market Prophit's benefit to shut down Market Prophit's Platform to extract payment and equity concessions; (b) secretly retaining and commingling Market Prophit's proprietary code in Solfini-controlled Git repositories, contrary to Market Prophit's interests and for Defendants' benefit; (c)

misusing Market Prophit's confidential information and technology assets for Defendants' own benefit; (d) covertly reclassifying invoice line items from "Software development" to "Software maintenance" in an apparent effort to recharacterize the ownership of deliverables; and (e) withholding Market Prophit's property and refusing to cooperate with an orderly transition.

123. As a direct and proximate result of Defendants' fiduciary breaches, Market Prophit has suffered and continues to suffer damages directly caused by the misconduct, including: (a) loss of use of its Platform since August 17, 2026; (b) lost revenue and business opportunities, including lost investment and financing opportunities; (c) remediation and rebuilding costs; and (d) other directly resulting losses, in an amount to be proven at trial.

**COUNT VIII — DECLARATORY JUDGMENT (28 U.S.C. §§ 2201–2202)**
(Against Both Defendants)

124. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

125. An actual, justiciable controversy exists between Market Prophit and Defendants concerning the ownership of software code, the validity of the termination notices, and the rights and obligations of the parties under the ICA, the SLA, the Services Arrangement, and the Bitget Agreement.

126. This controversy is ripe and Market Prophit has standing because it is present and immediate, not hypothetical: the termination notices have issued, Market Prophit's Platform has been offline since August 17, 2026, and Defendants continue to withhold Market Prophit's code, databases, Git repositories, and other property. Market Prophit is a party to the ICA, the SLA, the Services Arrangement, and the Bitget Agreement, and is the claimed owner and licensee whose contractual and property rights are directly affected. The issues are concrete and sufficiently defined to be resolved by this Court now, without reliance on contingent future events.

127. A declaration of the parties' respective rights is necessary to govern any continuing relationship and to prevent further disputes and further purported terminations.

128. Market Prophit is entitled to a judicial declaration that: (a) Market Prophit is the sole owner of all Developments and Materials created under ICA § 4, including, without limitation, all software, source code, algorithms, quantitative models, UI components, API adapters, data pipelines, database schemas, and technical documentation created, modified, or delivered during the ICA engagement; (b) Market Prophit is the owner of any software developed under the Services Arrangement and of the Bitget Integration developed under the Bitget Agreement; (c) Market Prophit holds a fully-paid, perpetual, royalty-free license to all pre-existing components and elements embedded in the Developments and Materials under ICA § 4; (d) Solfini's August 3, 2026 and August 16, 2026 termination notices are void and of no legal effect; (e) absent an earlier contractual termination event, the SLA term remains in full force and effect through December 31, 2034; (f) the SLA contains no cross-default provision, the SLA's termination provision does not extend to sums invoiced under the Services Arrangement, the invoices at issue had no agreed due dates or payment terms, and no amount remained unpaid for 45 days or more after any agreed due date; (g) Defendants had no contractual or legal right to shut down, disable, or withhold Market Prophit's Platform on August 17, 2026 or thereafter; (h) Market Prophit owns the property acknowledged as owned by Market Prophit in SLA Appendix A, including the PHP website code, the baseline zip archive and all modifications thereto, the 24 Java executables, the MP_PROD database, and the beta.marketprophit.com/copy-trade-app deployment; and (i) Market Prophit owns the exchange integrations developed under the ICA, the Bitget Integration, the code implementing the quantitative model, all modifications made to Market Prophit's pre-existing code, and the Git repositories containing Market Prophit's property, wherever maintained and by

whomever held.

**COUNT IX — BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
(Against Both Defendants)

129. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

130. The ICA and SLA each contain an implied covenant of good faith and fair dealing, which requires each party to refrain from arbitrary or unreasonable conduct that has the effect of preventing the other party from receiving the fruits of its bargain. The SLA and ICA are silent on several matters that the parties did not anticipate but that bear directly on Market Prophit's ability to receive the benefit of those agreements, including: (a) whether Solfini, as both licensor and the operator of the hosting infrastructure on which the licensed Software ran, could use its operational control over that infrastructure to disable the licensed Software for reasons unrelated to the SLA; (b) how a "due date" is to be determined under SLA § 2 for any sum not governed by SLA § 3, and whether Solfini could fix such a due date unilaterally and retroactively; and (c) whether Solfini and Mack could use the exclusive administrative access to Market Prophit's servers, repositories, and credentials that they held solely to perform services under the ICA as leverage in unrelated commercial disputes. Had the parties addressed these matters at contracting, they would have agreed that Solfini could not do any of these things.

131. Defendants breached the implied covenant by, among other things: (a) using Solfini's control over the hosting infrastructure to disable the SLA-licensed Software and the entire Platform in order to collect disputed non-SLA invoices; (b) unilaterally assigning after-the-fact due dates to undated Services Arrangement invoices, in order to manufacture a basis to invoke SLA § 2; (c) timing the August 16, 2026 notice and the August 17, 2026 shutdown to follow

immediately upon Mack's August 14, 2026 equity demand, and conditioning restoration on acceptance of the proposed Equity Cure Agreement and Tolling Agreement, so as to use the threat of losing the licensed Software to extract concessions that Market Prophit had no contractual obligation to provide; (d) altering the description on Services Arrangement invoices from "Software development" to "Software maintenance" in an effort to recharacterize the deliverables and undermine Market Prophit's rights in them; and (e) making a partial, unusable transfer beginning on or about September 28, 2026 that gave the appearance of compliance while depriving Market Prophit of the functional benefit of its license and its property.

132. Defendants' conduct was arbitrary and unreasonable, was undertaken in bad faith for the purpose of obtaining payment on terms, and concessions, that Market Prophit had no contractual obligation to provide, and deprived Market Prophit of the fruits of its bargain.

133. As a direct and proximate result of the foregoing implied-covenant breaches, Market Prophit has suffered and continues to suffer damages, including: (a) loss of the benefit of the SLA license, loss of its owned and licensed property, and loss of use of Market Prophit's Platform since August 17, 2026; (b) lost revenue and business opportunities, including lost investment and financing opportunities; and (c) costs of remediation, restoration, and rebuilding necessitated by the shutdown, in an amount to be proven at trial.

## COUNT X — UNJUST ENRICHMENT
(Against Both Defendants)

134. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein. This Count is pleaded in the alternative to Counts I through IV pursuant to Fed. R. Civ. P. 8(d)(2) and (3), and applies only to the extent the trier of fact determines that the Services Arrangement or the Bitget Agreement does not exist, is invalid or unenforceable, or does not govern the payments and deliverables described below.

135. There is a bona fide dispute concerning the existence, scope, and terms of the Services Arrangement and the Bitget Agreement. The Services Arrangement was never reduced to a writing, because Mack refused Market Prophit's repeated requests to execute one, and Defendants dispute its terms, including by unilaterally asserting payment due dates that were never agreed, by recharacterizing invoiced "Software development" as "Software maintenance," and by contending that software developed thereunder is "Solfini-owned or licensed software" that need not be delivered to Market Prophit. Defendants likewise dispute that the Bitget Agreement obligates them to deliver the source code, executables, and Git repositories for the Bitget Integration. Neither the ICA nor the SLA governs the payments Market Prophit made, or the deliverables it paid for, under the Services Arrangement or the Bitget Agreement.

136. Market Prophit conferred a direct benefit on Defendants at its own expense. Market Prophit paid Defendants for software development services under the Services Arrangement, including monthly payments of $11,500 for "Software development," in amounts to be proven at trial, and paid Defendants $18,500 in full for the development and delivery of the Bitget Integration. Upon information and belief, those payments were received by Solfini and inured to the personal benefit of Mack, its sole member, who personally solicited and invoiced the work, directed its performance, and controlled Solfini's receipt and use of the funds.

137. Defendants accepted and retained those payments while withholding the very software, source code, executables, Git repositories, and other deliverables for which Market Prophit paid, and while disabling those deliverables as part of the August 17, 2026 shutdown of the Platform. Defendants have thus retained both the payments and the value of the paid-for work product, and Market Prophit has received nothing usable in return.

138. This Count does not duplicate Market Prophit's conversion or trade secret claims.

It seeks restitution of monies Market Prophit paid to Defendants, measured by the amounts paid and the value of the benefit Defendants retained, rather than damages for Defendants' interference with Market Prophit's ownership or possession of its property or for the misappropriation of its Trade Secrets.

139. It is against equity and good conscience to permit Defendants to retain the monies Market Prophit paid for the Services Arrangement deliverables and the Bitget Integration while withholding those deliverables. To the extent the trier of fact determines that no enforceable contract governs these payments and deliverables, Market Prophit has no adequate remedy at law for their recovery and is entitled to restitution from Defendants, jointly and severally, of all such monies and the value of the benefit Defendants retained, together with interest, in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Market Prophit, Inc. respectfully requests that this Court enter judgment in its favor and against Defendants Solfini LLC and Christopher Mack, jointly and severally, as follows:

A. An order of specific performance compelling Defendants to deliver to Market Prophit, in each case current as of August 17, 2026: (i) complete, current, uncompiled source code, executables, and full Git repositories for all Developments and Materials under ICA § 4, including all exchange integrations developed under the ICA (Binance, Bybit, MEXC), the backend trade-execution services that receive and act on trading signals, all code implementing the quantitative model, and all other Git repositories containing Developments and Materials, together with written specifications, plans, models, and technical documentation; (ii) complete copies of all pre-existing components and elements to which Market Prophit holds a fully-paid, royalty-free, perpetual

license under ICA § 4, and of the SLA-licensed software projects and components necessary to effect specific performance of the SLA license, including, to the extent they are SLA-licensed software, the quantitative model and UI components; (iii) all Market Prophit property listed in SLA Appendix A, including the PHP website code, baseline zip file and all modifications, 24 Java executables, the MP_PROD MySQL database (80+ tables), and the beta.marketprophit.com/copy-trade-app deployment; (iv) all database backups and snapshots; (v) all credentials, API keys, DNS/hosting/administrative credentials, configuration and deployment files, and deployment scripts and crontabs; (vi) reasonable technical documentation and information; (vii) confirmatory intellectual-property assignments; (viii) complete, current, uncompiled source code, executables, and full Git repositories for all software and other deliverables developed under the Services Arrangement and the Bitget Agreement, including the Bitget Integration; and (ix) a certification of completeness;

B. A temporary restraining order and/or preliminary injunction: (i) ordering Defendants to restore, or permit Market Prophit to restore, Platform operations or, alternatively, ordering immediate delivery of all materials necessary for Market Prophit to self-host and to restore the Platform to full operational functionality as it existed on August 17, 2026; (ii) ordering Defendants to deliver all source code, data, database backups and snapshots, executables, documentation, credentials, configuration and deployment files, and other property to Market Prophit within five (5) business days; (iii) prohibiting Defendants and any person or entity acting under their direction or control from deleting, altering, destroying, or failing to preserve any source code, Git repositories, Git history, databases, database backups and snapshots, customer data, or other Market Prophit property; (iv) prohibiting Defendants from using, disclosing, licensing, selling, or transferring any Market Prophit intellectual property, Trade Secrets, or customer data;

(v) prohibiting Defendants from further interfering with Market Prophit's business operations; (vi) requiring Defendants to maintain the status quo and preserve, in their current state, all servers, computers, storage and other devices, Git repositories, and data in their possession, custody, or control that contain Market Prophit property; (vii) permitting expedited discovery; and (viii) requiring Defendants to certify compliance;

C. A permanent injunction on the same terms as the preliminary injunction;

D. A declaration that: (i) Market Prophit is the sole owner of all Developments and Materials under ICA § 4; (ii) Market Prophit holds a fully-paid, perpetual, royalty-free license to all pre-existing components and elements included in the Developments and Materials under ICA § 4; (iii) Market Prophit owns all software and other deliverables developed under the Services Arrangement and the Bitget Agreement, including the Bitget Integration and all modifications to Market Prophit's pre-existing code or, in the alternative, holds an implied assignment of, or an implied, irrevocable license to, all such software and deliverables; (iv) Solfini's August 3 and August 16, 2026 termination notices are void and of no legal effect; (v) the SLA term remains in full force and effect through December 31, 2034; (vi) the SLA contains no cross-default provision, the SLA's termination provision does not extend to sums invoiced under the Services Arrangement, the invoices at issue had no agreed due dates or payment terms, and no amount remained unpaid for 45 days or more after any agreed due date; (vii) Defendants had no right to shut down, disable, or withhold Market Prophit's Platform; and (viii) Market Prophit owns the property acknowledged as owned by Market Prophit in SLA Appendix A, including the PHP website code, the baseline zip archive and all modifications thereto, the 24 Java executables, the MP_PROD database, and the beta.marketprophit.com/copy-trade-app deployment;

E. Compensatory damages for breach of contract, breach of the implied covenant of

good faith and fair dealing, misappropriation of trade secrets, breach of fiduciary duty, and conversion in an amount to be determined at trial;

F. In the alternative to contract damages under Counts I through IV, restitution of all monies Market Prophit paid to Defendants under the Services Arrangement and the Bitget Agreement, including the $18,500 paid for the Bitget Integration, and the value of all benefits Defendants have unjustly retained, in an amount to be determined at trial;

G. Exemplary damages of up to two times actual damages for willful and malicious misappropriation of trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(C);

H. Reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D);

I. Pre-judgment and post-judgment interest at the maximum rate permitted by law;

J. Costs and attorneys' fees to the extent permitted by law or contract;

K. A waiver of any bond requirement pursuant to ICA § 8 and SLA § 8, or alternatively a nominal bond; and

L. Such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff Market Prophit, Inc. hereby demands a trial by jury on all issues so triable.

Dated: October 20, 2026
Albany, NY

**HINCKLEY ALLEN & SNYDER LLP**

By: */s/ Christopher V. Fenlon*
Christopher V. Fenlon (CF6305)
30 South Pearl Street, Suite 1101
Albany, New York 12207
P: (518) 396-3100
E: cfenlon@hinckleyallen.com
*Attorneys for Plaintiff Market Prophit, Inc.*